**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **WIN & SON, INC. and** | : | |
| **HUAN YI YU,** | : | **CIVIL ACTION** |
| **Plaintiffs,** | : | |
| | : | **No. 13-5977** |
| **v.** | : | |
| | : | |
| **CITY OF PHILADELPHIA et al.,** | : | |
| **Defendants.** | : | |

**MCHUGH, J.**                                                    **FEBRUARY 10, 2016**

**<u>MEMORANDUM</u>**

This case concerns the obligations of a municipality when it seeks to condemn and demolish privately-owned buildings that are in imminent danger of collapse.  Plaintiffs Win & Son, Inc. and Huan Yi Yu brought this action against the City of Philadelphia (the "City"), along with government contractors, USA Environmental Management, Inc. ("USAEM") and Pedro Palmer Construction, Inc. ("PPC"), alleging that Defendants improperly demolished a warehouse owned by Plaintiffs and in the process destroyed a collection of valuable art and artifacts stored within.  The parties have engaged in extensive discovery, and each Defendant now moves for Summary Judgment on all counts against it.  Plaintiffs Cross-motion for Summary Judgment on Counts II, III, IV, V, VII, and IX.  This Memorandum addresses those Motions as they pertain to the City and to the Constitutional claims against USAEM.

## I.   Statement of Facts[1]

Plaintiff Huan Yi Yu and his wife, Jianhong Xu, are officers of the Win & Son company.[2]  Yi Yu 9/11/14 Dep. at 14:3–15:18.  In 2005, Win & Son purchased a warehouse property at 1325 W. Albanus Street in the Logan section of Philadelphia ("the property") for $150,000, which they used for storage purposes.  Plaintiffs claim that they used the warehouse to store several thousand pieces of valuable Chinese antiques and precious rocks, as well as electronic equipment and a forklift, worth more than $10 million.  Compl. at ¶¶ 16–18. Defendants do not dispute that some personal property was stored inside of the warehouse at the time of the events in question, but the authenticity and value of those goods is hotly contested and the subject of another motion pending before this court.  Although the couple resided in New York, they periodically visited Philadelphia to check on the property.  Xu Dep. at 61:24–62:25.

On the evening of March 16, 2011, the City's Department of Licenses and Inspections ("L&I") was notified that there had been a collapse reported at the property.  The on-duty inspector, Gerald James, was dispatched to the property, and police responded to the scene. James Dep. at 45:18–46:21.  James inspected the property and completed an Emergency Duty Report detailing his findings.  Emergency Duty Report, City's Ex. F.  His report noted that the property looked vacant at the time and had boarded-up windows, and approximately 500 feet of the front wall façade of the building had collapsed onto the sidewalk.  He assessed the property and determined that the structural integrity of the building was compromised and should be

---

[1] The parties have each submitted their own Statement of Undisputed Facts, but they characterize the facts somewhat differently.  I will recount the facts upon which the parties agree and point out the parties' disputes as they arise.

[2] There appears to be some lack of clarity regarding whether Win & Son is registered as a corporation or a limited liability company.  *See* City's Statement of Undisputed Facts at ¶¶ 1–2.  This distinction does not affect the present Motions, and the Complaint uses both "Inc." and "LLC" interchangeably, so I will simply refer to the entity as "Win & Son."

considered "imminently dangerous."[3]  He checked "yes" indicating that a violation of the

Philadelphia Property Maintenance Code should be issued for the property, and the property

should be condemned.  He also recorded on the form that he posted a bright orange "imminently

dangerous" poster on the side of the building, which listed the date of the inspection and stated

that the property may be demolished if not repaired.[4]

Once James entered the information from his report into L&I's case management system,

the case was referred to the Contractual Services division, and notice of the violation was

automatically generated to be sent to the record owners of the property.  The notice stated that

the property had been declared imminently dangerous in accordance with the Philadelphia

Property Maintenance Code because the front wall was "bulged and in danger of collapse."  It

instructed Win & Son that it must repair or demolish the structure, or it may appeal the violation

within five days.  The violation warned, "If you fail to comply with this order forthwith, the City

may demolish the structure."  March 16 Violation Notice, City's Ex. H.

This notice, dated March 16, 2011, was sent to Win & Son at 1325 W. Albanus Street via

certified **and** regular mail.  The Complaint alleged that at all times material to the present action,

"Plaintiff Win and Son, LLC had address for service listed as 136 Bowery Street, Unit 705, New

York, New York 10013," and the notice should have been sent there.  Compl. at ¶ 19.  However,

Plaintiff Huan Yi Yu admitted in his deposition that this address was not established until June

2012, after the events in question.  Yi Yu 9/12/14 Dep. at 250:3.  At the time the notice was

---

[3] The Philadelphia Property Maintenance Code instructs officials to classify a structure as "imminently dangerous" if "there is an immediate danger of failure or collapse of a structure or any part thereof which endangers life."  *See* Phila. Code § PM-308.1(R)(1)-(6).

[4] Mr. James reported that he was later unable to recall specifically posting the sign on this property, and although protocol requires inspectors to take a photograph of the imminently dangerous poster, the City has been unable to locate or produce any photograph.  James Dep. at 54:18–55:2; McCarthy Dep. at 116:3–22.  In addition, Plaintiff produced a Google Earth photo of the property purportedly taken on March 26, 2011 that shows no orange poster.  Finally, Plaintiff's wife Jianhong Xu stated in her deposition testimony that she did not see the orange poster when she visited the property in March 2011.

issued, the deed recording the sale of the property listed the owner as Win & Son, with the

company's address as 1325 W. Albanus Street.  2005 Deed for 1325 W. Albanus, City's Ex. C.

The company's registration with the State of Pennsylvania also lists the entity's address as 1325

W. Albanus Street.  Pennsylvania Dept. State Corp. Search, City's Ex. A.  In their Motion for

Summary Judgment, Plaintiffs recognize these facts and appear to have conceded that the only

address listed on file with the City was 1325 W Albanus Street.

The copy of the notice sent via certified mail was returned to L&I with a sticker stating:

RETURN TO SENDER
NO SUCH NUMBER
UNABLE TO FORWARD

The sticker is dated March 25, 2011.  City's Ex. I.  City records do not reflect that the violation

notice sent via regular mail was similarly returned.  The City took no further actions to provide

notice of the violation.

On April 10, 2011, Plaintiff's wife Jianhong Xu made a brief visit to the warehouse.

Plaintiff Yu was not present because he was in China at the time.  She reported that she did not

see an orange poster on the side of the building, and while she spent approximately ten minutes

in the warehouse, she stated she did not check the mail because she was in a hurry.  Xu Dep. at

65:3–19, 77:6–22.  Ms. Xu stated at her deposition that she did notice a small hole in the roof

during this visit, but she did not report the hole to her husband or make any arrangements to

repair it.  Xu Dep. at 74:22–76:16.  After a break during testimony, she then denied seeing such a

hole.  Xu Dep. at 90:6–11.

The property's condition continued to decline, and on June 18, 2011, the City again

inspected the structure.  Photographs taken on that day show a large amount of trash (including a

large number of bricks and a mattress) on the sidewalk, a large hole in one exterior wall and the

4

roof, a large plant growing out of a window, and bulging and cracking exterior walls.  City's Ex.
M.  It bears emphasis that this later inspection was a full three months after the City documented
approximately 500 feet of collapsed wall along the front of the building.

If an imminently dangerous violation is issued and the owner does not respond within ten
days, the building may be placed on the City demolition list, which is triaged with the most
dangerous buildings being demolished first.  Phila. Code § PM-308.4; Emergency Services and
Abatement Unit ("ESAU") Field Manual, City's Ex. K at 4–6.  Once the City decides to
demolish a structure, it typically solicits bids from demolition contractors to perform the work.
The City maintains a list of contractors that have submitted paperwork and gone through a
procurement process to be pre-approved, and only those contractors are invited to bid.  Mulderig
Dep. at 33:25–38:2.  The City's standard demolition bid process involves a meeting at the site
during which approved contractors can assess the property, then bids are faxed to the City and
the winning bidder must begin demolition within 24 hours.  ESAU, City's Ex. K at 6.  However,
if a building poses an immediate danger to the public, thereby creating a need for an emergency
demolition, the City may hold a curbside bid at the site.  ESAU, City's Ex. K at 7.  The
contractor awarded such a contract must begin demolition within three hours.  ESAU, City's Ex.
K at 7.  The City requires the contractor to secure a building permit and submit proof of all
licenses to L&I.  Demolition Specifications at 3.13.

In this case, the City elected to initiate the process for a curbside bid on June 18, 2011.
Six contractors viewed the property and entered bids for the project.  Although Defendant
USAEM maintains that Pedro Palmer was never their employee, they authorized Pedro Palmer to
go to the site and enter a bid on USAEM's behalf.  Palmer Dep. at 41:2–13.  On the bid sheet,
Palmer wrote "USA Environmental" for the Company name and signed his own name on the

signature line.  L&I's bid records, City Ex. O.  USAEM's bid was the lowest at $39,333, and a contract was executed between the City and USAEM for the demolition of 1325 W. Albanus Street.  USAEM then sub-contracted the work to PPC, a company owned by Pedro Palmer, to perform all of the services required for the demolition job.  Pls.' Ex. L.

The parties agree that PPC was not on the City's list of approved contractors.  In addition, the Demolition Specifications provide that upon confirmation that a contractor has won a bid, "the Contractor shall notify the Department in writing of the names of all subcontractors proposed for the various parts of the work, and shall not employ any without written approval from the Department."  Demolition Specifications at 3.14.  The consequence for not doing so is temporary suspension from the City Bidder's List.  *Id.*  USAEM admits that in this case they did not obtain pre-approval to use PPC as a subcontractor.

The City requires that all contractors perform their work in accordance with the City's published list of Master Demolition Specifications.  USAEM's contract with PPC also required that PPC perform all work in accordance with those specifications.  Pls.' Ex. L at 32.  L&I inspectors are instructed to conduct weekly inspections of the site to insure the contractor complies with these specifications.  ESAU Field Manual, City's Ex. K at 7.  Generally, this document is limited to instructions regarding the physical means by which a demolition may occur, including regulations of the types of tools that may be used (e.g., power operated wrecking equipment is permitted, but not swinging balls), the order in which the demolition is to occur (e.g., from top to bottom, one floor at a time), and what sorts of materials may be used to backfill the cellar spaces (e.g., cement is approved, but not plaster).  Demolition Specifications at 3.6, 3.6.2, 3.6.6.  The Demolition Specifications require the contractor at completion of the work to remove from the site all accumulated materials and leave the site in a clean condition.

Demolition Specifications at 3.18.  The demolition is not considered complete, and contractors are not paid, until a City Inspector verifies that this has occurred.  However, the Demolition Specs also provides that "[a]ll materials of any nature removed from within the limits of the site, *except … private property* … shall become the property of the Contractor, and shall be removed from the site as it accumulates."  Demolition Specifications at 3.4 (emphasis added).

On June 27, 2011, just over a week after the demolition bid, a neighbor called Ms. Xu to notify her that the property was being demolished.  Xu Dep. at 80:6–22.  She traveled to Philadelphia the next day and went with a friend to the property.  Xu Dep. at 81:8–10, 122:24–123:4.  She reports that she told the workers that she owned the building, and she took photographs of the demolition as it occurred.  Palmer testified that he interacted with Ms. Xu, but he did not let her onto the property:

> Q: Was she taking pictures of the building?
> A: Yes, and us.  She wanted to hit me as well.
> Q: And did she tell you why?
> A: Because I was tearing down her building.

Palmer Dep. at 93:12–94:4; *see also* Palmer Dep. at 75:1–7.

The parties have slightly differing accounts of what happened with the property stored inside the building as it was being demolished.  Xu also testified that when she first arrived, she could see that approximately seventy percent of the goods stored in the building were still inside at the time.  Palmer similarly testified that when PPC workers first entered the building, they saw some boxes and crates but did not immediately touch them:

> Q: Did you or your employees have to move any of the boxes or crates to do your work?
> A: When we started to knock stuff down, we were working on the left.  The boxes and crates were on the right, so everything we took out was going into the dumpster from where we were working.

Palmer Dep. at 64:7–14; *see also* Palmer Dep. at 61:18–32:2.  Palmer stated that they did not

open the crates until Xu arrived.  Palmer Dep. at 63:13–15.  However, Palmer did admit to

selling a statute that he found in the warehouse:

> THE WITNESS: Somebody came and offered me $100 for a figure, I'm guessing
> sculpture.  And I said, sure, take it.
> …
> Q: Did you accept $100?
> A: Yes.
> Q: Did you tell USA Environmental that you did that?
> A: I told Jim [Miszic, USAEM supervisor].
> Q: Was Jim at the site when you did that?
> …
> A: No, he was not there.

Palmer Dep. at 29:4–19.

> Q: The statute that you said you sold for $100, can you describe what that looked
> like?
> A: I think it was a lion.
> Q: And how big was it?
> A: Three or four feet from the floor.  Not very large.
> Q: And where did you find that statue?
> A: It was in the demolition site
> …
> Q: Was it in a crate?
> A: No.

Palmer Dep. at 31:16–32:9.

> Q: There was a fence surrounding the demolition site, correct?
> A: Yes.
> …
> Q: How did they [the person who bought the statue] know there was a statue, to
> your knowledge?
> A: I had it outside already to be thrown away.

Palmer Dep. at 77:10–22.  Palmer claims that this occurred before Xu arrived:

> Q: When did you sell that statue?
> A: I don't remember the exact day.  Maybe two days in.
> Q: Was it before the owners arrived?
> A: Yes.

8

Palmer Dep. at 63:20–64:2.  However, Xu claims that she saw at least one such transaction take place:

> THE WITNESS: We saw the whole transaction from outside, and they were making deals.
> …
> Q: Describe what you saw.
> A: I don't know how much money was transacted, but I saw money exchanged.
> Q: Was it in coins?  Was it in paper money?
> A: In paper.
> Q: How do you know that the money was given for that?
> …
> A: When he walked out after the transaction, we caught him, we asked him to return, and he said he paid for it.

Xu Dep. at 162:5–21.

At some point, someone communicated to USAEM employee Jim Miszic that someone was at the property requesting the belongings inside the building, and he reported that to Albert McCarthy at L&I; McCarthy said he instructed Miszic to "put it on the sidewalk for her." McCarthy Dep. at 102:4–10.  Miszic then communicated this back to Palmer.  Palmer Dep. at 73:2–7.  On June 30, 2011, Xu and her companions were permitted to access the job site.  Palmer testified that he sent someone for the purpose of assisting the group with loading the items. Palmer Dep. at 88:5–16.

Xu was allowed to pull up a small truck to the site and load in some of the items stored in the warehouse.  She reported that at that point, the most valuable items had all been demolished or removed, but they found some antique tables, meteors, dinosaur eggs, heavy rocks, dolls, glass vases, and wooden furniture.  Xu Dep. at 170:23–171:17, 173:8–13.  However, they did not load all of these items.  Xu specifically explained that they did not load all of the rocks because they were heavy, they did not load the meteorites because there were only a few pieces left on the

ground, and she could not recall why they did not load the Huang Hua Li tables.  Xu Dep. at

170:12-22, 14–25.  Palmer stated that "they took everything."  Palmer Dep. at 71:22.

## II.    Summary Judgment Standard

Summary judgment is proper "if the pleadings, the discovery and disclosure materials on

file, and any affidavits show that there is no genuine issue as to any material fact and that the

movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c)(2).  A fact is material if

it "might affect the outcome of the suit under the governing law," and a dispute is genuine "if the

evidence is such that a reasonable jury could return a verdict for the nonmoving party."

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  "Factual disputes that are irrelevant

or unnecessary will not be counted."  *Id.*

The party moving for summary judgment has the initial burden of identifying the portions

of the record that demonstrate an absence of a genuine issue of material fact.  *Celotex Corp. v.*

*Catrett*, 477 U.S. 317, 323 (1986).  "The non-moving party must then "rebut the motion with

facts in the record and cannot rest solely on assertions made in the pleadings, legal memoranda,

or oral argument."  *Berckeley Inv. Group. Ltd. v. Colkitt,* 455 F.3d 195, 201 (3d Cir. 2006).  In

making its decision, the court should "view the record in the light most favorable to [the non-

moving party] and resolve all reasonable inferences" in the non-moving party's favor.  *Jones v.*

*School Dist. of Phila.*, 198 F.3d 403, 409 (3d Cir. 1999) (citing *Deane v. Pocono Med. Ctr.*, 142

F.3d 138, 142 n.3 (3d Cir. 1998) (en banc)).  While it is not a court's role to make credibility

determinations or weigh the evidence, a court must assess "whether the evidence presents a

sufficient disagreement to require submission to a jury or whether it is so one-sided that one

party must prevail as a matter of law."  *Liberty Lobby*, 477 U.S. at 251–52.

III.    **Constitutional Claims**

Plaintiff brings several constitutional claims pursuant to 42 U.S.C. § 1983, including:
Violation of Procedural Due Process (Count II), Violation of Substantive Due Process (Count
III), Violation of the Fourteenth Amendment of the U.S. Constitution (Count IV), and Violation
of Civil Rights (Count V).  These claims were all previously dismissed as to Defendant Palmer.
*See* Court's December 8, 2014 Order, Doc. No. 81.  The remaining defendants now move for
summary judgment as to these claims, and Plaintiffs have filed a cross-motion.

A.   *Liability of USAEM under § 1983*

As a preliminary matter, Defendant USAEM argues that it cannot be held liable under
§ 1983 for violation of constitutional rights because it is not a state actor.[5]  This is the same
argument advanced, successfully, by Defendant PPC in its Motion to Dismiss.  *See Id.*  USAEM
argues that "[n]ow, at the close of fact discovery, it is even more apparent based on the record
before this Court, that Plaintiffs have no evidence USAEM is a state actor."  Def. USAEM's
Mem. Supp. Mot. Summ. J. at 5 n.5.  I agree.

The Third Circuit has outlined three broad tests to determine whether a private actor has
engaged in state action:

> (1) "whether the private entity has exercised powers that are traditionally the
> exclusive prerogative of the state";

---

[5] As explained in the Court's earlier ruling on Defendant Palmer's Motion to Dismiss, in order to state a valid claim
pursuant to § 1983, a plaintiff "must allege the violation of a right secured by the Constitution and . . . show that the
alleged deprivation was committed by a person acting under color of state law." *West v. Atkins*, 487 U.S. 42, 48
(1988) (citations omitted).  The Third Circuit treats § 1983's "under color of law" provision identically to the
Fourteenth Amendment's "state action" requirement.  *Becker v. City Univ. of Seattle*, 723 F. Supp. 2d 807, 810 (E.D.
Pa. 2010) (citing *Kach v. Hose*, 589 F.3d 626, 646 (3d Cir. 2009)).  A private entity may be a state actor where
"such a close nexus between the State and the challenged action that seemingly private behavior may be fairly
treated as that of the State itself."  *Kach*, 589 F.3d at 646.  This nexus determination requires a fact-specific inquiry,
*Groman v. Twp. of Manalapan*, 47 F.3d 628, 638 (3d Cir. 1995), and the Court is mindful that " '[a]cts of ... private
contractors do not become acts of the government by reason of their significant or even total engagement in
performing public contracts.' "  *Horton v. USA Envtl. Mgmt., Inc.*, No. 13-3352, 2013 WL 5377284 at *4 (E.D. Pa.
Sept. 24, 2013) (quoting *Rendell–Baker v. Kohn*, 457 U.S. 830, 841 (1982)).

(2) "whether the private party has acted with the help of or in concert with state officials"; and

(3) whether "the [s]tate has so far insinuated itself into a position of interdependence with the acting party that it must be recognized as a joint participant in the challenged activity."

*Kach v. Hose*, 589 F.3d 626, 646 (3d Cir. 2009).  Plaintiffs appear to focus on the first prong, arguing that since the City "is the only party with lawful right to enter and demolish imminently dangerous properties," and the only entity with authority to approve subcontractors, USAEM "stepped into the shoes of the City" and became a state actor by entering the property and subcontracting the demolition to PPC.  Pls.' Mem. Opp'n Def. USAEM's Mot. Summ. J. at 6–7.  But this mischaracterizes the scope of activities properly considered the "*exclusive* prerogative of the state."  *See Groman v. Twp. of Manalapan*, 47 F.3d 628, 639–40 (3d Cir. 1995); *Flagg Bros.*, 436 U.S. at 158.  While only the state may have the power to lawfully seize Plaintiff's property, the actual demolition of dangerous buildings is not an exercise of power exclusively reserved to the state.

This case is analogous to *Groman*, in which the Third Circuit considered the case of a private first aid squad that responded to a police request for medical care for the plaintiff.  The Court held that because the squad was a private entity not under the formal control of the municipality, it was not a state actor even though (1) the squad provided medical care to the plaintiff while he was in state custody, (2) it did so at the request of police, (3) the police had a constitutional obligation to provide the medical care, and (4) the squad received public funds.  *Groman*, 47 F.3d at 642.  Likewise, although only the City had the right to condemn Plaintiffs' property, USAEM did not become a state actor simply because it performed the demolition on behalf of the City.  Under *Groman*, the fact that USAEM performed the work under the government's control, did so at the City's request, and received government funds does not make

it a state actor.  The record shows that USAEM was not permitted to perform any discretionary *government* functions.  In particular, it did not make the decision to declare the building "imminently dangerous" or exercise its judgment in determining when it was necessary to demolish the building.  Its actions were limited to fulfilling the terms of its contract with the government subject to the Master Demolition Specifications.  *See, e.g., Munoz v. City of Union City*, 481 F. App'x 754, 761 (3d Cir. 2012) (holding that a private demolition contractor was not a state actor, despite carrying out the demolition pursuant to a contract with the city government).  The fact that it violated those Specifications by delegating the work to a non-approved contractor does not change this analysis, as those specifications define the obligations of private contractors and have no applicability to the exercise of any governmental power. Therefore, Defendant USAEM's Motion for Summary Judgment will be granted as to Counts II–V, and Plaintiffs' Motion will be denied as to Defendant USAEM on those same counts.

   B.  *Liability of the City of Philadelphia under § 1983*

      The remaining constitutional claims are directed against the City.  Preliminarily, it is important to note that a government entity may not be held vicariously liable under § 1983 for the acts of its employees under a *respondeat superior* theory of liability.  *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978).  "Instead, it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983."  *Id.* at 694.  Proof of a single incident of unconstitutional activity by a municipal employee is insufficient to impose liability unless it can be linked to an existing policy.  *City of Oklahoma City v. Tuttle,* 471 U.S. 808, 823–24 (1985).

Therefore, because Plaintiffs have chosen to sue the City itself, rather than any individual municipal representatives, they may only succeed in these claims if they can (1) identify a policy, practice, or custom, (2) attribute it to the city, and (3) "show a causal link between execution of the policy and the injury suffered." *Losch v. Parkesburg*, 736 F.2d 903, 910 (3d Cir. 1984) (citing *Bennett v. City of Slidell*, 728 F.2d 762, 767 (5th Cir. 1984)).

     1.  <u>Count II: Procedural Due Process</u>

Plaintiffs claim that their rights under the Due Process Clause of the Fourteenth Amendment were violated when the City demolished their property without first notifying them that the building had been declared imminently dangerous and affording them an opportunity to appeal the decision or repair the property. Pls.' Mem. Supp. Mot. Summ. J. at 5. The Due Process Clause requires that a "deprivation of life, liberty or property by adjudication be preceded by notice and opportunity for hearing appropriate to the nature of the case." *Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 428 (1982) (citing *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 313 (1950)).

Plaintiffs argue that notice was constitutionally deficient in this case because the certified mail receipt was returned, and Plaintiffs have failed to prove that notice was posted on the building. The City, however, responds by noting: "Plaintiffs have failed to identify any policy or custom that was the moving force behind the alleged violations. To the contrary, Plaintiffs have identified numerous City policies and customs designed to ensure that the City provides the owners of property with constitutionally-appropriate notice prior to demolishing their properties." Def. City's Mot. Summ. J. at 7–8. I agree.

As outlined above, because no individual City employee has been sued, the relevant inquiry is whether the City's policies, practices, or customs were adequate to ensure that Plaintiffs received the notice to which they were entitled under the Due Process Clause. The City has cited several official policies that ensure that sufficient notice is given. The Philadelphia Property Maintenance Code instructs government officers that if an imminently dangerous condition is found, they must "serve on the owner, agent or person in control of the structure a written notice describing the imminent danger and specifying the required repair to render the structure safe, or requiring the imminently dangerous structure or portion thereof to be demolished within a stipulated time." Phila. Code § PM-308.2. The Property Code instructs officials to consult the Philadelphia Administrative Code to determine the methods of delivery of this notice that the City should use. Phila. Code § PM-306.3.1. These include: personal delivery; first class mail to the last known residence or business address of the owner; certified or registered mail with a return receipt requested; or leaving the notice in the possession of an adult family member or person in charge of the premises or place of business. Phila. Code § 4-A-502.4. Although any of these methods may be used, "[i]f no address is known or the *mail is returned indicating no delivery,* a copy of the notice shall be posted in a conspicuous place at the entrance or avenue of access to the premises in violation." Phila. Code § 4-A-502.4 (emphasis added). In addition, the Property Maintenance Code provides that "[*r*]*egardless* of whether the person addressed with a notice of imminent danger receives service by one or more of the methods specified in the administrative code, a copy of the notice shall be posted in a conspicuous place on the premises. Phila. Code § PM-308.3 (emphasis added).

These official policies are contained in several different documents to ensure that City employees are aware of these required procedures. For example, the Emergency Services and

Abatement Field Manual instructs L&I inspectors to send notice of violations by regular and certified mail.  ESAU, City's Ex. K at 4.  The Field Manual requires an inspector designating a property as imminently dangerous to post a bright orange violation notice on the side of the building.  ESAU, City's Ex. K at 3.  The Manual also instructs inspectors that an owner has five days to appeal a violation notice, and "[i]f an appeal has been made, the process is stopped until the appeal is heard."  ESAU Field Manual, City's Ex. K at 4.  Even after the building is placed on the bid list, and even in the case of emergency demolitions, inspectors are instructed to check the return receipt of the certified mail to ensure the owner received notice, check to see if the property has been sold since the violation was issued (in which case the new owner must be given notice), and check to see whether the owner has obtained a permit to repair the property.  ESAU Field Manual, City's Ex. K at 7.  L&I director Scott Mulderig testified that inspectors are given various trainings throughout their careers with respect to the required procedures for providing notice to owners of properties declared Imminently Dangerous.  Mulderig Dep. at 86:11–87:4.

I am convinced that these policies are sufficient to ensure "reasonably calculated" notice to property owners before their property is seized and demolished by the City.  The methods prescribed by the Administrative Code—mail and personal service—are constitutionally adequate under the governing case law.  "Due process does not require that a property owner receive actual notice before the government may take his property."  *Jones v. Flowers*, 547 U.S. 220, 226 (2006) (citation omitted).  Rather, "due process requires the government to provide 'notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections.' " *Id.* (citing *Mullane*, 339 U.S. at 314).  The means of providing notice employed must be those that someone

might reasonably use if he actually desires to inform the recipient.  *Id.* at 299 (citing *Mullane*, 339 U.S. at 315).  The government must also consider unique information about an intended recipient, like knowledge that the recipient is in prison or incompetent, when assessing whether the notice is "reasonably calculated" to reach the recipient.  *Id.* at 230.

*Jones* is instructive because the specificity of the opinion.   There, the Government attempted to send notice to the address of a property that was tax-delinquent via certified mail, but the mail was returned as unclaimed.  It then proceeded with a sheriff's sale.  The Supreme Court held that due process entitled the property owners to more.  Notice by mail is typically constitutionally sufficient, but only so long as the government has "heard nothing back indicating that anything had gone awry."  *Id.* at 226.  Where the government becomes aware that its attempt at notice has failed, due process requires the government to take "additional reasonable steps … if practicable."  *Id.* at 227, 234.  The Supreme Court held that additional steps should have then been taken to attempt to contact the owner in that case, and it suggested (1) resending the notice by regular mail (which would not require a recipient at the property to sign for the delivery), (2) address otherwise undeliverable mail to "occupant," or (3) post notice on the front door.  *Id.* at 235.  The Court specifically rejected the suggestion that the government should be required to conduct an open-ended search for a new address of the property owner.  *Id.* at 236.

 The City's policy here appears to be based upon a close reading of *Jones*, requiring multiple methods of providing notice that include both regular and certified mail, and posting, and further requiring a review of City records to see if remedial action by the owner is in process.

Plaintiffs go so far as to argue that they are entitled to summary judgment because there is evidence the required "imminently dangerous" sign might not have been posted.  This not only

reveals a misunderstanding of Rule 56, but an even more fundamental misunderstanding of Plaintiffs' burden in establishing liability against a municipality under *Monell*.  Plaintiffs revealed their misunderstanding most clearly when they make the following argument in response to the City's Motion for Summary Judgment:

> … Plaintiffs have sufficiently identified the policy and/or custom that is the moving force behind their allegations: the City's decision to demolish Plaintiff's property, and the execution of said demolition.  Moving Defendant [the City] asserts the only policies Plaintiffs have identified are those aimed at providing constitutionally appropriate notice prior to demolition.  However, the City failed to abide by said policies and customs and Plaintiffs suffered injuries as a result.

Pl.'s Opp'n Def. City's Mot. Summ. J. at 4.  In simple terms, Plaintiffs have not put forth a lack of adequate policies, which is their burden, but a lack of compliance with what are, by Plaintiffs' own arguments, otherwise fully adequate policies.  There may be genuine issues of fact regarding whether notice was actually provided in this case, or whether particular government employees failed in their responsibilities to follow City policies, but they are not *material* under the theory Plaintiffs have pursued.  Plaintiff has chosen to sue the City alone rather than the offending officers.  The City had sufficient guidelines in place to ensure notice was given, and in the absence of any evidence that such guidelines were routinely ignored, then those violations did not occur *pursuant* to a policy or custom of the City.  Plaintiffs' claims must fail as a matter of law.

2. Count III: Substantive Due Process

Plaintiffs also bring a claim for violation of Substantive Due Process, arguing that the City deprived them of fundamental property interests in a way that should shock the conscience of the Court.  *See Nicholas v. Pennsylvania State Univ.,* 227 F.3d 133, 140 (3d Cir. 2000); *United Artists Theatre Circuit, Inc. v. Twp. of Warrington,* 316 F.3d 392, 399 (3d Cir. 2003).

This paints with too broad a brush, because the Supreme Court has held that "[w]here a particular Amendment provides an explicit textual source of constitutional protection against a particular sort of government behavior, that Amendment, not the more generalized notion of 'substantive due process,' must be the guide for analyzing these claims." *Albright v. Oliver*, 510 U.S. 266, 273 (1994). By definition, in a case involving the seizure of property, the Fourth Amendment is implicated. *United States v. James Daniel Good Real Prop.*, 510 U.S. 43, 50 (1993). It is also self-evident that where sufficiency of notice is at issue, it is principally the *procedural* due process provisions of the Fourteenth Amendment that apply.

This conceptual overlap is demonstrated by Plaintiff's Complaint. The specific actions identified as shocking—failure to give notice of the impending demolition and use of a non-approved contractor—form the basis for Counts II (procedural due process) and IV (unreasonable seizure), respectively. Under *Albright,* it would be improper to consider the same conduct separately under the doctrine of substantive due process. *See El Malik v. City of Philadelphia*, 2007 WL 984455 at *7 n.2 (E.D. Pa. Mar. 26, 2007) (Padova, J.) ("Although Plaintiffs do allege that Defendants acted arbitrarily and oppressively in the demolition of their buildings, their claim fits squarely within the contours of the Fourth Amendment's protections.").

Even if I were to consider it permissible for Plaintiffs to raise a separate substantive due process theory as permissible, Plaintiffs' proof falls far short of anything shocking. By Plaintiffs' own evidence, the City had sufficient policies to prevent buildings from being demolished arbitrarily, and they had an approval and oversight process for contractors and sub-contractors. *See* Master Demolition Specs at 3.14, Mulderig Dep. at 38. Without evidence that these policies were routinely ignored (and to a shocking degree)—not just that oversight may have been lacking in this particular case—the City cannot be held liable under *Monell*.

3.   Count IV: Unreasonable Seizure

Plaintiffs also contend that the demolition constitutes an unreasonable government seizure of their property in violation of the Fourth Amendment.  While the City obviously concedes that demolition constitutes a seizure, it counters that it had sufficient policies to ensure that any such seizure would be conducted reasonably.

The seizure and demolition of dangerous properties is within a state's valid police power. *Camara v. Municipal Court of San Francisco*, 387 U.S. 523, 537 (1967)).  The Fourth Amendment requires that searches and seizures of private property be conducted reasonably, and what is reasonable depends on the context within which a search or seizure takes place.  *New Jersey v. T.L.O.*, 469 U.S. 325, 337 (1985).  The reasonableness determination requires the court to balance both private and government interests.  *Soldal v. Cook Cty.*, 506 U.S. 56, 71 (1992).

Once again, in the absence of any individual defendant, I must evaluate this claim through the prism of *Monell.*  The record shows that the City had policies in place to ensure homes were only seized and slated for demolition if they posed a danger to the public.  The City's Property Maintenance Code provides that a building would be classified as "imminently dangerous" upon a finding that part of the building "is likely to fail … or to collapse," that a portion of the structure "is of obvious reduced strength or stability," that any portion of the structure "has wracked, warped, buckled or settled to such an extent that walls or other structural elements show substantially reduced load resisting capacity," or that the structure "is likely to partially or completely collapse" due to dilapidation, deterioration or decay.  Phila. Code § PM-308.1(R)(1)-(6).

The property first came to the City's attention in mid-March 2011, when L&I received notice of a partial collapse.  The contemporaneous inspection report from Mr. James reflected

that **500 feet** of the front wall had collapsed onto the sidewalk, leading him to conclude that the building was imminently dangerous.  That set in motion the City's procedures for providing notice, which was sent to the owner's address of record.  The City's re-inspection, on June 18, 2011, as documented in numerous photographs, found loose bricks strewn on the sidewalk adjacent to the building where the wall was collapsing, loose mortar, clear evidence of water infiltration on the exterior brick wall and joints, partial collapse of the roof, exposed holes, bulging of the foundation, and foliage growing through the window from inside.  City's Ex. M.

The photographic evidence alone is compelling.  It is supplemented by the opinion of an engineer retained by the City for purposes of this litigation, who concludes, based on the inspectors' observations and photographs that "certain documented degraded conditions of the building envelope were allowing moisture intrusion into the building," and "the bulging brick walls and mortar wear were evidence of significant degradation of the brick walls."  Daniels Report, City Ex. N at 12.  The engineer concluded that in addition to the partial wall collapse that had already occurred by the time of the demolition on June 18, 2011, "[t]he remaining building portions would likely experience further collapse without warning or notice, in that the structural integrity of the building was visibly and significantly compromised, as evidenced by masonry walls that were deformed and degraded, metal panel walls that were missing, steel bar joists that had failed to support concrete roof panels, and portions of the roof that were missing."  Daniels Report, City Ex. N at 13.  This report refers at length to an evaluation conducted in 2004 when Plaintiffs acquired the building, conducted by US Inspect Commercial Real Estate.  That report, some seven years prior, noted in part: "the roof decking and roof surface is in need of immediate repairs and replacement.  … Indications of active leakage were observed at several locations.  Many ineffective patched areas were also observed."  Daniels Report, City Ex. N at 3.  In

addition, "A visually discernible convex distortion exists in the front and rear brick walls.  The condition is common in buildings of this age and type construction. … No structural reinforcement is currently warranted.  However, we recommend monitoring the affected walls to confirm suspected stability."  Daniels Report, City Ex. N at 5.  Xu testified that some repairs were performed on the gutters, the roof, and the foundation of the building, and a wall was added inside the building after this report was written in 2004, Xu Dep. at 55:7–18, but the conditions as of 2011, documented in photographs, show profound deterioration.

As the City points out, "Plaintiffs have not adduced any expert evidence that refutes either Mr. Daniel's conclusions or the Department's designation [of the building as imminently dangerous]."  Def. Cit's Mot. Summ. J. at 15.  The record evidence unambiguously indicates that the building posed a danger to safety and public welfare.  Therefore, the City's action in demolishing it according to their valid procedures is a rational and reasonable seizure.

To the extent that Plaintiffs' argument is that the personal property inside the warehouse was unreasonably seized, the record shows that the City's own policy was that property owners retained the right to personal property found inside a building, and a good faith effort should be made to return such property to owners if they ask.  Demolition Specifications at 3.4; Mulderig Dep. at 51:20–22, 52:25–53:4, 53:11–14.  Rather than citing any evidence in the record that this policy was customarily ignored, Plaintiffs repeat the error of arguing that the City's actions in regard to the personal property constituted a "blatant disregard for personal property [that] is contrary to the City's own regulations."  Plaintiff's Statement of Undisputed Facts at ¶ 53.  Once again, by arguing that Plaintiffs' rights would have been protected had the City's employees followed its policies, Plaintiffs unwittingly foreclose *Monell* liability against the City itself.

Plaintiffs also repeatedly point out that the City allowed Defendant PPC to conduct the demolition, even though it was not pre-approved as a sub-contractor per the City's approval procedures. This does not mean that the demolition was conducted in an "unreasonable" manner for purposes of the Fourth Amendment. As discussed above, the Demolition Specifications do not confer or define substantive rights. In addition, the decision to grant the bid to USAEM, and USAEM's subsequent decision to sub-contract the demolition to Palmer, occurred after the City seized Plaintiffs' property and made the decision to demolish it. Any later lapses in the approval process are wholly irrelevant.

    4.   Count V: Violation of Civil Rights

Plaintiffs also include an additional count for "Violation of Civil Rights." The import of this is entirely unclear. Though pleaded as a separate claim in the Complaint, all parties treat it as being addressed by the other constitutional claims. Disposition will therefore track the other claims; the City's Motion is granted as to Count V, and Plaintiffs' Motion is denied.

**IV.    Negligence Claims Against the City[6]**

Plaintiff's first negligence count against the City, labeled "Negligent Demolition," alleges that it "breached [its] duty to provide Plaintiffs with actual and proper notice." Compl. at ¶ 63. The other negligence count asserted against the City, labeled simply as "Negligence," claims that the City breached its "duty of care to not disturb Plaintiffs' personal property within the warehouse." Compl. at ¶ 115.

Under the Pennsylvania Political Subdivision Tort Claims Act (the "Tort Claims Act"), the City enjoys absolute immunity from tort liability unless one of eight specific exceptions applies. 42 Pa.C.S. § 8541; *Kiley v. City of Philadelphia*, 645 A.2d 184, 185 (Pa. 1994). "[B]ecause of the clear intent [of the Act] to insulate government from exposure to tort liability,

---

[6] The remaining tort claims against USAEM and PPC will be addressed in a separate ruling.

the exceptions to governmental immunity are to be strictly construed." *Lockwood v. City of Pittsburgh*, 751 A.2d 1136 (Pa. 2000) (citation omitted).  Plaintiffs argue that the real property exception, 42 Pa.C.S. § 8542(b)(3), and the personal property exception, 42 Pa. C.S. § 8542(b)(2), apply.  There are, however, other requirements that must also be met, including a requirement that the plaintiff establish that "[t]he damages would be recoverable under common law or a statute creating a cause of action if the injury were caused by a person not having available a defense under section 8541 (relating to governmental immunity generally) or section 8546 (relating to defense of official immunity) …" 42 Pa.C.S. § 8542(a)(1).

Plaintiffs do not address this requirement at all.  The City's actions here—identifying and reacting to a threat to public safety—are characteristic of the exercise of governmental power. Private parties do not engage in such activities, which renders the common law unavailing to Plaintiffs.  Nor do they cite any statute that prescribes duties on the part of the City.  The Constitutional obligation of the City to proceed in accordance with Due Process does not emanate from the law of torts and does not suffice to meet the requirements of the Tort Claims Act.

Setting aside whether the City had such a duty, the claim does not fit within the confines of the real property exception to immunity, which reads as follows:

> *Real Property*.--The care, custody or control of real property in the possession of the local agency,[7] except that the local agency shall not be liable for damages on account of any injury sustained by a person intentionally trespassing on real property in the possession of the local agency.

42 Pa.C.S. § 8542(b)(3).

---

[7] Although in general the City's power of inspection and regulation will not suffice to establish "possession" of property, *City of Pittsburgh v. Estate of Stahlman*, 677 A.2d 384, 386 (Pa. Commw. Ct. 1996), one would assume that the authority to condemn and demolish a property would at least qualify as constructive possession.

Pennsylvania courts have held that "[t]o maintain a negligence claim under the real property exception, the plaintiff must prove that his or her injury resulted from a dangerous condition *arising from* the local agency's care, custody or control of the real property." *Oliver v. Tropiano Transp., Inc.*, 79 A.3d 1233, 1240 (Pa. Commw. Ct. 2013) (emphasis added).  The only dangerous condition here was the product of Plaintiffs' neglect of the property.  In no sense can it be said that such condition arose from the City's brief involvement with the property, all of which was intended to ameliorate a public threat.  Application of the real property exception to these facts would create an absurd and anomalous result.

A further requirement of the Act is that the injury must be "caused by the negligent acts of the local agency or an employee thereof acting within the scope of his office or duties with respect to one of the categories" of exceptions.  42 Pa.C.S. § 8542.  Any harm caused by a "failure to supervise adequately or control the conduct" of a third party is outside the scope of the real property exception.  *Moles v. Borough of Norristown*, 780 A.2d 787, 791–92 (Pa. Commw. Ct. 2001).  In *Moles*, the Court held that the Tort Claims Act immunized the Borough of Norristown from liability for a demolition because "[t]he negligence action was based, not on the negligent actions of the Borough itself or one of its employees, but on the failure to prevent the negligent actions of Geppert, an independent contractor."  *Id.*[8]

Plaintiff argues that the City created a dangerous "situation" by handing over control of the property to an unapproved and unqualified contractor.  Pls.' Mem. Opp. City's Mot. Summ. J. at 12–13.  That is materially different than causing a dangerous condition of the property. Although the Pennsylvania cases interpreting the real property exception are often conceptually vague and sometimes almost contradictory, one principle that clearly emerges is that municipal

---

[8] I rely upon *Moles* only with respect to its application of the language of the statute.  It also cites *Mascaro v. Youth Study Center*, 532 A.2d 1118 (Pa. 1987), but the scope of *Mascaro* has been significantly limited by later cases.

employees must directly impact the property in some way that gives rise to the condition that causes injury.  Absent such a nexus, liability is denied.  Thus, where the gravamen of the claim is not that the municipality's own employees created the risk, but rather that they failed to supervise third parties such as independent contractors, the real property exception does not apply.  *Nardo v. City of Phila.*, 988 A.2d 740 (Pa. Commw. Ct. 2010).  Because the allegations against the City here have nothing to do with the condition of the property itself, but are focused upon the City's procedures for selecting and supervising contractors, no claim has been stated under the Act.

Plaintiffs also invoke the personal property exception, 42 Pa.C.S. § 8542(b)(2), but their argument that the City's conduct falls within this exception is the same as their argument for the real property exception.  Similar principles control.  *See Sugalski v. Commonwealth of Pennsylvania,* 569 A.2d 1017 (Pa. Commw. Ct. 1990).

Accordingly, the Tort Claims Act immunizes the City from damages arising from the demolition of Plaintiffs' property.  The City's Motion for Summary Judgment will be granted as to Counts I and VI.

## V.    Intentional Torts

Plaintiffs also bring tort claims against the City for Conversion (Count VII) and Trespass (Count VIII).[9]  "The Tort Claims Act, however, renders the city immune from claims based on willful or malicious conduct.  It waives governmental immunity only with respect to 'negligent acts,' and specifically declares that negligent acts do not include willful or malicious conduct." *Lory v. City of Philadelphia,* 674 A.2d 673, 675 (Pa. 1996).  Conversion is an intentional tort under Pennsylvania law.  *Norriton E. Realty Corp. v. Cent.-Penn Nat. Bank*, 254 A.2d 637, 638

---

[9] Plaintiffs also move for summary judgment against the City for Count IX, Conspiracy, but this count was not asserted against the City in the Second Amended Complaint.  Therefore, Plaintiffs' Motion for Summary Judgment on Count IX against the City is denied.

(Pa. 1969).  Trespass is also an intentional tort to "the extent deliberate conduct is averred," and to the extent that the claim avers mistaken conduct, it does not fall within an exception to governmental immunity for negligence.  *Roehrig v. Twp. of Cass*, No. 1144 C.D. 2014, 2015 WL 5478354, at *4 (Pa. Commw. Ct. Aug. 18, 2015).  The City is therefore immune from these claims.

Plaintiffs argue that these claims against the City "are offshoots of Plaintiffs' claims that [the City] violated Plaintiffs' civil rights by unconstitutionally entering and subsequently talking [sic] Plaintiffs' property without due process. … [S]uch claims are tied to the constitutional violations."  Pl.'s Opp'n Def.  City's Mot. Summ. J. at 13.  Absent some citation of authority, the legal significance of these bold proclamations is completely unclear to the Court.  Just as Section 1983 cannot be used to "constitutionalize" the law of torts,  *Howell v. Cataldi*, 464 F.2d 272, 278 (3d Cir. 1972), the Constitution cannot be invoked to create a state law tort claim.  To the extent that Plaintiffs advance Counts VII and VIII as raising "implicit" constitutional claims, they are subsumed within the explicit constitutional claims against the City discussed and dismissed above.  The City's Motion for Summary Judgment is therefore granted, and Plaintiffs' Motion for Summary Judgment is denied as it pertains to the City for the same counts.

An appropriate order follows.

_____/s/ Gerald Austin McHugh_
United States District Court Judge