IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| WIN & SON, INC. and | : | |
| HUAN YI YU, | : | CIVIL ACTION |
|         Plaintiffs, | : | |
| | : | No. 13-5977 |
|         v. | : | |
| | : | |
| CITY OF PHILADELPHIA et al., | : | |
|         Defendants. | : | |

MCHUGH, J.                                                                                                       APRIL 15, 2016

### MEMORANDUM

This case arises out of the City-ordered demolition of a warehouse building that Plaintiffs were using at the time to store imported art and artifacts.[1] It raises a unique issue about the duty, if any, owed by a demolition contractor to the owner of a condemned property. The facts of the case are set forth in a prior Memorandum, available at *Win & Son, Inc. v. City of Philadelphia*, __ F.Supp.3d __, No. 13-5977, 2016 WL 538213 (E.D. Pa. Feb. 11, 2016). For present purposes, the central fact is that the property in question had been deemed imminently dangerous by the City of Philadelphia, and Defendants were contracted by the City for immediate demolition.

Remaining before the Court are separate Motions for Summary Judgment on all counts filed by Defendants USAEM and PPC (hereinafter "Defendants"), and a Cross-Motion for Summary Judgment on Counts VII and IX by Plaintiffs.

---

[1] Plaintiffs' Second Amended Complaint ("SAC") asserted constitutional and state law claims against the City of Philadelphia ("the City"), as well as the contractor, USA Environmental Management, Inc. ("USAEM"), and sub-contractor, Pedro Palmer Construction, Inc. ("PPC"), that performed the demolition. The Court previously issued Orders dismissing all claims against the City and all constitutional claims against the contractor Defendants.

1

**I.  Unintentional Torts**

   *A. Count I: Negligent Demolition*

Plaintiffs assert two negligence counts against Defendants.  The first is labeled "Negligent Demolition," and it asserts that "Defendants … by the authority granted to Defendants as private entities by contract, had a duty to provide the Plaintiffs, property owners, with notice of any alleged code violations and the opportunity to correct such violations or repair any structural concerns prior to the premises at 1325 West Albanus Street being demolished," and that Defendants "breached their duty to provide Plaintiffs with actual and proper notice."  SAC at ¶¶ 62–63.

In practical terms, Plaintiffs seek to take a traditional obligation of governmental entities—to give notice to citizens before interfering with their private property—and extend the notice requirement to demolition contractors as well.  This Court previously dismissed this same claim against two other contractors hired by the City in relation to the demolition, finding:

> the law plainly requires L&I to provide notice to a building owner regarding code violations and any impending demolition of the owner's building.  In contrast, Plaintiffs have not identified any legal authority that imposes a similar duty to notify on contractors that L&I or the City hires in connection with any demolition….  We therefore conclude that Plaintiffs have failed to plausibly allege that [contractors] Mr. D's or Synertech had a duty to provide the Plaintiffs with notice of any code violations or the impending demolition.

Court's February 18, 2014 Order at 11–12.  Once again, Plaintiffs have not cited any legal authority that would justify placing the burden of giving notice on a private contractor.

In reality, such a duty would be impractical, as the record demonstrates private contractors would have no means to verify information about the owners of any particular property, or the existence of code violations, aside from the records of the City itself.  *See* Mulderig Dep. at 144–45.  The evidence in this case clearly indicates that Defendants relied

2

upon the City's representations.  The City was present at the demolition site for an emergency "curbside" bid.  It had already declared the property imminently dangerous, and the building's appearance, documented in the photos taken that day, was such that there would be no reason to question that determination.  The duty urged by Plaintiffs would in effect render the demolition contractors "quality control" for the city.  To embrace such a duty would not only be paralyzing to the contractor, who would be compelled to do an independent and comprehensive records search before proceeding with a demolition, but inimical to public safety because of delay.  Therefore, consistent with prior orders in this case, Defendants' Motions for Summary Judgment are both granted as to Count I.

    B. *Count VI:  Negligence*

Count VI asserts a separate tort law claim against Defendants, labeled simply "Negligence," and it alleges Defendants breached a duty of care with respect to Plaintiffs' personal property stored within the warehouse.  Specifically, Plaintiffs argue that the contractors had a "duty to conduct the demolition with reasonable care and in accordance with the City's Master Demolition Specifications."  Pls.' Opp'n Def. USAEM's Mot. Sum. J. at 8.  More particularly, they allege that such reasonable care would require contractors to "make provisions for Plaintiff's personal property" and avoid "destroying and/or discarding" the items contained in the warehouse.  Pls.' Statement of Undisputed Facts at ¶¶ 56, 62.

The Demolition Specifications are not a model of clarity.  They require the contractor at completion of the work to remove from the site all accumulated materials and leave the site in a clean condition.  Demolition Specifications at § 3.18.  The demolition is not considered complete, and contractors are not paid, until a City Inspector verifies that this has occurred.  However, the Demolition Specifications also provide:

3

> All materials of any nature removed from within the limits of the site, *except* public utility property, *private property*, and building corner stones, shall become the property of the Contractor, and shall be removed from the site as it accumulates. No material pending sale shall be permitted to be stored on or adjacent to the site of the work other than the material to be used for cellar fill. No public sale of material shall be permitted from the site.

Demolition Specifications at § 3.4 (emphasis added).

The cryptic phrase "except … private property" certainly supports the view that the owner of the building retains rights over its contents. But the Specifications themselves shed no light on what, if any, responsibility the contractor has to preserve such property. They do, however, limit the contractor's options for doing so because no material of any kind can be stored at the site, and by work's end the site must be entirely clear.

Neither Plaintiff nor Defendants have identified any legal authority defining the obligation of a demolition contractor regarding the contents of an imminently dangerous building. Nor has the Court. I am therefore painting on a blank canvas. I agree with Plaintiffs that under Pennsylvania law, novel questions of duty should be decided using the factors outlined by the Supreme Court in *Althaus v. Cohen*, 562 Pa. 547, 553, 756 A.2d 1166, 1169 (2000). These are: "(1) the relationship between the parties; (2) the social utility of the actor's conduct; (3) the nature of the risk imposed and foreseeability of the harm incurred; (4) the consequences of imposing a duty upon the actor; and (5) the overall public interest in the proposed solution." *Id.*

Regarding the first factor, Defendants did not undertake to enter into any direct relationship with Plaintiffs. The demolition contractors were present on commercial property owned by Plaintiffs only because the City of Philadelphia exercised its power to protect public safety. The City owed a duty to Plaintiffs, but that duty flowed from its status as an entity exercising governmental authority.

4

Nor can I endorse a responsibility to seek out a relationship with the owner. By its very nature a condemned property suggests abandonment. In light of the condition of the property when the contractors arrived—collapsed walls, a hole in the roof, and foliage growing inside—it was reasonable for the them to assume that no owner would be returning to collect his property. Also, as PPC points out, the contractors had a competing and primary duty to the City by virtue of their contracts to proceed with demolition immediately and finish without delay.[2]

Second, PPC argues that the social utility of their activity—demolishing an imminently dangerous building—surpasses the value of the duty Plaintiffs propose. Plaintiffs suggest that the social utility of protecting the public is served as soon as contractors put a fence around the building to prevent the entrance of the public while the owner is located. Oral Arg. Tr. at 31:17–24. The City obviously did not believe that a fence would protect the public from debris or falling objects in the event of collapse. Plaintiffs also ignore the danger that such a property poses to the demolition contractors themselves. The social utility of demolishing a dangerous structure is high, particularly when compared to the interests of private parties in having their possessions protected—possessions they themselves placed at risk.

The social utility of proceeding with demolition must be weighed against the third factor—the nature of the risk and foreseeability of the harm to Plaintiffs. The harm to property owners from continuing the demolition of a building without safeguarding the personal property inside is self-evident, and such harm could be substantial depending on what is contained within. However, Pennsylvania courts take into account whether the defendant created or expected the

---

[2] USAEM Supervisor Jim Miszic testified that it was his understanding that once the City told them a property was in danger of collapsing and needed to be demolished to prevent harm to others, they could not stop the demolition unless told otherwise by the City; it was therefore USAEM's policy that if anyone approached a worksite claiming that they were the owner of the home and instructing the workers to stop demolition, USAEM would instruct the person to contact the City. Miszic Dep. at 58:10–59:14.

5

possibility of that harm. *See Althaus*, 756 A.2d at 1170. Plaintiffs themselves initially created the danger when they allowed their building to deteriorate, and the building's demise was underway even before demolition commenced. PPC cogently argues that it was by no means foreseeable that an owner would care about or seek to preserve property in a seemingly-abandoned building, especially when it was reasonable to presume that the City had provided notice of the demolition. PPC Mem. Supp. Mot. Summ. J. at 4; Oral Arg. Tr. at 16:9–23.

The fourth *Althaus* factor assesses the consequences of imposing the proposed duty on the demolition contractor. PPC also persuasively argues:

> The negative consequences of imposing a duty on Moving Defendant [PPC] to protect building contents during emergency demolitions are great, as such a duty would cause demolition to be delayed and/or proceed at a hindered pace with dangerous conditions persisting and creating a risk of harm or death to demolition contractors, passersby and neighbors.

PPC's Memo in Supp. Mot. Summ. J. at 4–5. That risk extends to an owner who requests access to their belongings inside; for that reason, the Philadelphia Property Maintenance Code at the time prohibited an owner from accessing a building declared imminently dangerous except to repair or demolish the structure. Phila. Code § PM-308.1 (repealed effective July 1, 2015).

The record is clear that the warehouse presented a clear and imminent danger to the public and needed to be demolished as quickly as possible. Creating a duty to take inventory, work around, transport, or store items in premises ordered for immediate emergency demolition would place contractors at risk, hinder demolition, and delay the City's ability to remedy dangerous conditions, thereby endangering the public.

Furthermore, the contours of such a duty are unclear, which may deter demolition contractors from bidding for this dangerous but necessary work because of the risk of liability. Plaintiffs argue that their proposed duty can be fulfilled in part by complying with the City's

6

Master Demolition Specifications, but as noted previously, those provide no precise guidance regarding questions like where a contractor should put objects while safeguarding them, how long to search or wait for the record owner before proceeding, or how to determine whether a person requesting the items is the record owner.  Such an obligation would conflict with the City's primary goal of clearing the site.  *See* Master Demolition Specifications at § 3.1.5 ("Contractor shall remove form the site all materials and clean all rubbish from the cellars."); 3.10 ("Pedestrian and vehicle traffic must be continuously maintained. … [T]he demolition area (sidewalks and street) must be clear of all demolition debris by the end of each day."); 3.18 ("Contractor shall, at the completion of the work, … remove from the site all rubbish and accumulated materials and leave the site in a lean, orderly and acceptable condition and ensure that the site is free from hazard to the public.").

The record shows that it was the City's custom to return personal property to owners when practicable, but that informal practice required only that contractors should make a "good faith effort":

> Q: Well, does the city have any requirements with respect to what contractors do with regard to personal property?
> …
> A: My understanding is, we always try to make a good faith effort, if an owner shows up, to give them their belongings.  We've done it in the past.  That's basically it.
> Q: Does the owner require contractors to preserve property that's inside imminently dangerous buildings?
> …
> A: Again, if an owner shows up and wants their belongings, we'll make a good faith effort.  Otherwise, the material is put in a dumpster and taken to an approved landfill.

Mulderig Dep. at 52:8–53:14; *see also* Curran Dep. at 108:24–109:25 (stating that a contractor would only know how to identify the owner "if the owner is standing there saying, 'That's my stuff.' ").  Weighing the *Althaus* factors in light of these circumstances leads me to conclude that

7

Plaintiffs' proposed duty is untenable. Summary judgment will therefore be granted for Defendants on this count.[3]

In reaching this result, I address only emergency demolition of imminently dangerous structures. In the case of eminent domain or tax sales, different considerations may apply. But where time is of the essence, and the City has contracted for immediate demolition, an owner whose property is creating a risk to the public cannot expect the responding contractor to function like a moving company.

## II. Intentional Torts

### A. Count VII: Conversion

Plaintiffs' most compelling claim is for conversion. Under Pennsylvania law, "[a] conversion is the deprivation of another's right of property in, or use or possession of, a chattel, or other interference therewith, without the owner's consent and without lawful justification." *Stevenson v. Econ. Bank of Ambridge*, 413 Pa. 442, 451, 197 A.2d 721, 726 (1964) (citation omitted). "Not every destruction or deprivation of property amounts to a conversion; there must be an actual appropriation of it by the offending party for his own use." *Chrysler Credit Corp. v. Smith*, 643 A.2d 1098, 1100 (Pa. Super. Ct. 1994) (citation omitted). A conversion can be committed in several ways, including: (a) acquiring the property with an intent to assert a right to it; (b) transferring the property in a manner that deprives the owner of control; (c) "unreasonably withholding possession from one who has the right to it"; and (d) "[s]eriously damaging or misusing the chattel in defiance of the owner's rights." *Norriton E. Realty Corp. v. Central-Penn Nat. Bank*, 435 Pa. 57, 60, 254 A.2d 637, 638 (1969) (citing Prosser, Torts § 15 (2d ed. 1955)).

---

[3] Different considerations apply where a demolition contractor has safely taken possession of a building's contents and seeks to profit from their sale. These are addressed below.

8

After the City seized Plaintiffs' property and authorized the building's demolition, Defendants had a lawful justification for taking possession of everything on the premises in order to carry out their demolition contract with the City. Their temporary possession of the goods inside the building was therefore not an act of conversion. In addition, their failure to immediately tender the personal property by placing it on the sidewalk outside the fence, or by allowing Plaintiff's wife immediate access to the warehouse, does not constitute conversion. Pennsylvania law clarifies that withholding possession of goods is only an act of conversion if done *unreasonably* and *after* the owner has made a demand for them. *Id.* at 638–39. In this case, I see no genuine dispute that it was reasonable for Defendants to delay tendering the property until they were able to 1) safely access those goods and 2) confirm that the person on the property either was the owner or a person with authority from the owner to collect the goods.

Nonetheless, a property owner retains a continuing interest even after property is seized by virtue of the City's order. This principle is reflected in the Master Demolition Specifications, which provide that "[a]ll materials of any nature removed from within the limits of the site, *except … private property …* shall become the property of the Contractor." Demolition Specifications at § 3.4 (emphasis added). Although the workers on the property were privileged to exercise control over the property, even to the extent of removing it from the premises and transporting it to a landfill, they had no right to sell it for their own gain.

The record shows that Pedro Palmer admitted that he sold one statue before Plaintiff's wife arrived, while she testified that she saw several items sold from the site. Because there are genuine issues of material fact regarding the number of items converted, the individuals who performed the acts of conversion, and the value of those items, summary judgment must be denied.

9

1. <u>USAEM's Liability</u>

Although I find that there is sufficient evidence for a reasonable jury to find that at least one PPC employee converted Plaintiffs' property, Plaintiffs still carry the burden of proving that USAEM should be held vicariously liable for these acts.[4]

"It is the general rule that the employer of an independent contractor is not responsible for the misconduct of the contractor while the latter is performing under the terms of the contract." *Spinozzi v. E. J. Lavino & Co.*, 243 F.2d 80, 82-83 (3d Cir. 1957) (citing *Painter v. City of Pittsburgh*, 46 Pa. 213, 214 (1864); *Allen v. Willard*, 57 Pa. 374 (1868)). "Evidence of an employer-employee relationship *vis-a-vis* that of an independent contractor is controlled by the particular facts of each case. … Whether one is an independent contractor depends upon the extent to which he is, in fact, independent in performing the work." *Commonwealth v. Maker*, 716 A.2d 619, 625 (Pa. Super. Ct. 1998), *aff'd sub nom.*, *Commonwealth v. Loughard*, 563 Pa. 354, 761 A.2d 544 (2000). In an employee relationship, "the master not only controls the result of the work but has the right to direct the way in which it shall be done," whereas an independent contractor "has the exclusive control of the manner of performing it, being responsible only for the result." *Feller v. New Amsterdam Casualty Co.*, 363 Pa. 483, 486, 70 A.2d 299, 300 (1950) (citations omitted). The crucial inquiry is whether USAEM had the right to control PPC workers, even if it did not exercise that right. *See Moon Area Sch. Dist. v. Garzony*, 522 Pa. 178, 193, 560 A.2d 1361, 1369 (1989). For example, in *Moon Area*, the court held that the County had the requisite control over a parking lot operator because it retained the right to determine the operator's hours and day of operation, to inspect at any time, to revoke and impose additional rules and regulations, and generally to intervene to control the operation of the parking lot. *Id.*

---

[4] Plaintiffs argue that "Pedro Palmer and/or his company[] unlawfully converted Plaintiffs' property." Pl. Mem. Supp. Mot. Summ. J. at 26. PPC appears to have conceded that it, as a corporate entity, can be held liable for the acts of its employees, including Pedro Palmer himself, so I will limit the vicarious liability inquiry to USAEM.

10

In the present case, the record shows that USAEM checked in on PPC's progress daily, served as a liaison between PPC and the City, and retained the right to intervene when necessary. Miszic Dep. at 61–62.  In addition, it is clear that PPC was only able to gain access to this job because USAEM was authorized to bid on it.  USAEM was an entity on the City's list of approved demolition contractors, but PPC was not, so as a work-around, USAEM sent Pedro Palmer to bid on demolition contracts in their name and then promptly sub-contracted that work back to Pedro Palmer's company.  USAEM had the necessary "diplomatic credentials," which PPC employed on its behalf.  While I have found USAEM's failure to engage in the proper sub-contractor approval process to be irrelevant to many of Plaintiffs' other claims, I find it of crucial importance here.  In practical terms, PPC was standing in the shoes of USAEM in conducting the work, and I reject the notion that PPC was simply an independent contractor.  USAEM thus exercised sufficient control over PPC employees that they may be considered USAEM "servants."

That does not end the inquiry, particularly in the case of an intentional tort, because the wrongful conduct in question must nonetheless be within the scope of the servant's duty in order to create employer liability.  *Brennan v. Merch. & Co.*, 205 Pa. 258, 261, 54 A. 891, 892 (1903). Conduct is defined as being within the scope of a person's employment if:

> "(a) it is of the kind he is employed to perform; (b) it occurs substantially within the authorized time and space limits; (c) it is actuated, at least in part, by a purpose to serve the master, and (d) if force is intentionally used by the servant against another, the use of the force is not unexpectable by the master."

*Butler v. Flo-Ron Vending Co.*, 557 A.2d 730, 736 (Pa. Super. Ct. 1989) (quoting Restatement (Second) of Agency § 228(1)).  The Employer's "presence or absence when the act is performed, and whether it is done with or without his direct authority, do not affect the question of the master's liability to the party injured."  *Brennan*, 205 Pa. at 261, 54 A. at 892.  Except in cases in

11

which an employee engages in an excessive use of force, the issue of whether a person acted within the scope of employment is a question for the jury. *Fitzgerald v. McCutcheon*, 410 A.2d 1270, 1271 (Pa. Super. Ct. 1979).

Appropriate disposition of the building owners' personal property was directly within the scope of the work undertaken by PPC on behalf of USAEM, and the record is clear that USAEM had a good faith responsibility as an approved contractor to handle personal property in a way that would allow for its restoration to the owner where practicable. A reasonable jury could find that the acts of conversion were undertaken within the scope of employment, and therefore the Motions for Summary Judgment on this basis will be denied.

   B. *Count VIII: Trespass*

Plaintiffs also allege that Defendants' entrance onto the property constituted a trespass in violation of Pennsylvania common law.

> Under Pennsylvania law, [o]ne is subject to liability to another for trespass, irrespective of whether he thereby causes harm to any legally protected interest of the other, if he intentionally … enters land in the possession of the other, or causes a thing or a third person to do so.

*Liberty Place Retail Associates, L.P. v. Israelite Sch. of Universal Practical Knowledge*, 102 A.3d 501, 506 (Pa. Super. Ct. 2014). There is evidence that employees of both USAEM and of PPC entered the property.

Plaintiffs argue that even if Defendants relied on the City's grant of consent to enter the property, then that reliance was mistaken and does not excuse their trespass. Plaintiffs argue that the contractors' "right of entry is entirely premised on the City's properly notifying Plaintiffs of the imminently dangerous determination and impending demolition." Pl.'s Opp'n Def. USAEM's Mot. Summ. J. at 15. Because, in their view of the case, the City failed to provide proper notice, the contractors' permission to enter was invalid. If the City could be deemed a

12

trespasser then the same could be said of its demolition contractors.  But Plaintiffs misstate the law.

The City's power to seize and take possession of the property comes from the State's police power.  Although Due Process protects citizens from seizure of property without certain procedural safeguards, those safeguards do not form the **basis** of the City's power to seize.  *See Estate of Blose ex rel. Blose v. Borough of Punxsutawney*, 889 A.2d 653, 659 (Pa. Commw. Ct. 2005).  When a government entity has the right to enter and demolish a property, and it delegates that responsibility to a private contractor, it vests the contractor with the authority to exercise the privileges belonging to the government.  *Ference v. Booth & Flinn Co.*, 370 Pa. 400, 404, 88 A.2d 413, 414–15 (1952).

> [I]f the rule were otherwise, the bidding on contracts with a governmental instrumentality would be somewhat hazardous, because … [t]he contractor's bid is based upon the theory that the public agency has a legal right to submit its plans and specifications for the work to be performed, and that if he performs the work in accordance with the plans and specifications he will incur no liability in the absence of negligence."

*Valley Forge Gardens, Inc. v. James D. Morrissey, Inc.*, 385 Pa. 477, 484, 123 A.2d 888, 891–92 (1956) (internal quotations and citations omitted).  As discussed in the Court's February 10, 2016 Order, all evidence in this case indicates that this property was properly declared imminently dangerous, thereby giving the City a proper legal basis to seize it.  Once it did so, it had the authority to permit private contractors to enter the property in order to demolish it.

Admittedly, the City delegated this authority to USAEM, and USAEM sub-delegated the authority to PPC without gaining advance approval from the City.  The evidence indicates, however, that inspectors from the City observed and allowed the presence of PPC employees on the property; while the failure to gain advance approval factors into my analysis of vicarious liability for torts conducted on the property, I do not find that PPC's entry onto the property

13

constituted an unlawful trespass. Defendants' Motions for Summary Judgment are both granted as to Count VII.

C. *Count IX: Conspiracy*

Plaintiffs allege that Defendants engaged in a civil conspiracy under both federal and Pennsylvania law. As to a conspiracy claim under federal law, for which Plaintiffs cite cases decided under 42 U.S.C. § 1983, Defendants are correct that this goes beyond the SAC, which alleges only that USAEM and PPC engaged in a conspiracy to "take and/or convert Plaintiffs' personal property." SAC at ¶ 142. Even if I consider the merits of this claim, as set forth in my earlier opinion, USAEM and PPC are not state actors and were not given the discretion to declare the property imminently dangerous. In addition, the record evidence clearly indicates that the building posed a danger to safety and public welfare, so the City's actions in seizing it and demolishing it did not violate Plaintiffs' constitutional rights. The demolition contracts were signed *after* the City's decision to demolish the property, and cannot therefore be evidence of an unlawful purpose. Plaintiffs' federal conspiracy claim fails.

Plaintiffs also argue that Defendants' conduct constitutes a conspiracy under Pennsylvania state law. To prove such a civil conspiracy under Pennsylvania law, "it must be shown that two or more persons combined or agreed with intent to do an unlawful act or to do an otherwise lawful act by unlawful means." *Thompson Coal Co. v. Pike Coal Co.*, 488 Pa. 198, 211, 412 A.2d 466, 472 (1979) (citations omitted). "Proof of malice, i.e., an intent to injure, is essential in proof of a conspiracy," and "[t]his unlawful intent must be absent justification." *Id.* A conspiracy must often be proved by circumstantial evidence. *Id.* at 473 n.9. However, "an inference based upon a speculation or conjecture does not create a material factual dispute sufficient to defeat entry of summary judgment." *Robertson v. Allied Signal, Inc.*, 914 F.2d 360,

14

382 n.12 (3d Cir. 1990). Plaintiffs have produced no evidence that PPC and USAEM agreed together to convert Plaintiffs' merchandise with an *intent to injure* them.

In fact, although I refuse to allow USAEM to escape vicarious liability for any property converted, the evidence of record is that USAEM only found out about PPC's actions after they occurred:

> THE WITNESS [Pedro Palmer]: Somebody came and offered me $100 for a figure, I'm guessing sculpture. And I said, sure, take it.
> …
> Q: Did you accept $100?
> A: Yes.
> Q: Did you tell USA Environmental that you did that?
> A: I told Jim [Miszic, USAEM supervisor].
> Q: Was Jim at the site when you did that?
> …
> A: No, he was not there.
> Q: Was anybody from USA Environmental present when you did that? And by that, I mean sold the statue for $100.
> A: No.

Palmer Dep. at 29:4–24. The testimony of USAEM's representative was that Palmer denied any sales took place. Miszic Dep. at 53:8–17.

Plaintiffs further attempt to argue that USAEM's failure to oversee PPC's actions constitutes evidence of USAEM's *intent* to injure Plaintiffs, but that is untenable on its face. As Plaintiffs have not met their burden of producing sufficient evidence to support their conspiracy claims, summary judgment will be granted on that claim.

15

**III.  Statute of Limitations**

PPC again[5] argues that Plaintiffs' claims against it must be dismissed because the claims were not asserted within the two-year statute of limitations period.  Upon further consideration of the matter in light of a mature record, I still conclude that PPC had imputed notice of the suit within the relevant time period, and thus Plaintiffs' claims are not time-barred.  "Rule 15(c)(3) notice does not require actual service of process on the party sought to be added; notice may be deemed to have occurred when a party who has some reason to expect his potential involvement as a defendant hears of the commencement of litigation through some informal means." *Singletary v. Pa. Dep't of Corr.*, 266 F.3d 186, 195 (3d Cir. 2001).  Such notice can be imputed to a party if he has an "identity of interest" with a defendant who has been named in a complaint.  "Identity of interest generally means that the parties are so closely related in their business operations or other activities that the institution of an action against one serves to provide notice of the litigation to the other." *Id.* at 197 (citing 6A Charles A. Wright et al., Federal Practice and Procedure § 1499, at 146 (2d ed. 1990)).

The record evidence shows that USAEM frequently communicated and contracted with PPC in the course of its demolition business, and they shared equipment and storage space.  Miszic Dep. at 21–25, 40:1–2.  USAEM even authorized Pedro Palmer to act as its agent in the demolition bid process on multiple occasions and bid any amount without prior approval.  Miszic Dep. at 36:19–39:3, 41:3–42:5.  Plaintiffs' mistake in listing only USAEM was understandable since all of the official records from the City provided to Plaintiffs listed USAEM as the

---

[5] Plaintiffs originally filed a writ of summons in the Philadelphia Court of Common Pleas on May 31, 2013, then a Complaint on October 1, 2013.  The Complaint named USAEM and several other defendants.  On November 15, 2013, USAEM filed a Third-Party Complaint against PPC, and on February 5, 2014, Plaintiffs filed a Motion for leave to amend their Complaint to include PPC, which was granted.  PPC filed a Motion to Dismiss based in part on the statute of limitations; although that argument was not accepted at the time, the Court noted that the issue "may be raised again on summary judgment after discovery has produced more evidence bearing on the relationship between the Parties and Pedro Palmer Construction's notice of the lawsuit."  Court's December 8, 2014 Order.

demolition contractors, but USAEM knew right away that PPC was responsible and immediately filed a Third-Party Complaint against PPC once it was served with Plaintiff's Amended Complaint. The claims against PPC will not be dismissed based on the statute of limitations.

     /s/ Gerald Austin McHugh
United States District Court Judge